UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **GEORGE CONSTANCE, *as guardian and conservator for Enzo Evangelista, Jr.*,**<br><br>Plaintiff,<br><br>vs.<br><br>**CITY OF FRASER, et al.,**<br>Defendants. | 4:17-CV-11813-TGB-EAS<br><br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

After he ran a red light, Enzo Evangelista was pursued by police officers from the City of Fraser. Three police vehicles eventually boxed him in on three sides after he spun out on a slick road. Evangelista's car made contact with two of the police cars as he bumped back and forth, spinning his tires. Within seconds, one of the officers shot into Evangelista's vehicle, striking him in the head and the shoulder and causing injuries severe enough that he is currently represented by a conservator in this matter. Evangelista filed this lawsuit alleging both constitutional and state tort violations of his rights in connection with the shooting, as well as municipal liability against the City of Fraser. Defendants filed a Motion for Summary Judgment (ECF No. 48). For the reasons that follow, Defendant's Motion is **GRANTED IN PART** and **DENIED IN PART.**

1

## I.    BACKGROUND

Enzo Evangelista was driving in Clinton Township when Officer Eugene Chojnowski saw him run a red light. Chojnowski began following his car and turned on his sirens. Evangelista led the officer on a medium-speed chase for about six minutes. Compl., ECF No. 1, PageID.1-4. At some point during the pursuit, Officers Richard Cheung and Gary McLaughlin learned by radio that Chojnowski needed backup and headed toward his location.

Dash camera footage from all three cars[1] provides significant detail regarding the remainder of the encounter. Evangelista eventually turned left (eastbound) onto 15 Mile Road and lost control of his car, spinning once and ending up facing west in the westbound lane. #37, 4:17:05. Chojnowski made the turn and the two cars collided front-to-front. *Id.* at 4:17:06. Evangelista made a J-turn and pointed his car away from Chojnowski, ending up facing east in the westbound lane. *Id.* at 4:17:07-:11. As Evangelista executed this turn, Chojnowski drove forward so that his front was pointed at Evangelista's front passenger door; it is unclear from the video whether their cars made contact here or not. *Id.* at 4:17:12. Next, Evangelista began to reverse, and Officer Cheung's car (facing north in the westbound lane) appeared and boxed Evangelista out in the

---

[1] In accordance with Defendants' labeling of the exhibits, the footage available to the Court comes from Cameras #37 – Chojnowski, #35 – Cheung, and #31 – McLaughlin.

front. *Id.* at 4:17:12-:17. Chojnowski backed up, paused, and then moved forward, colliding with Evangelista's back right bumper. *Id.* at 4:17:18-:23. It is unclear whether Evangelista was also in motion at this time, but the positioning of Chojnowski's vehicle against the rear of the Evangelista's car resulted in Evangelista having very little room to maneuver. This collision caused a loud impact. #35, 4:17:21. Officer Cheung—at the front of Evangelista's car—can be heard saying "he just hit me" a few seconds later. #35, 4:17:23.

Officer McLaughlin arrived next and pointed his car northwest towards Evangelista's right rear door, boxing him out from the side. *Id.* at 4:17:27. Immediately after that, Officer Cheung fired four shots into Evangelista's car. #35, 4:17:29-31. There is no more discernable movement until an officer opens Evangelista's passenger door about twenty seconds later. #37, 4:17:52.

The dash camera footage does not completely document the incident. The parties are in accord as to the sequence of events up until Evangelista spun out. ¶¶ 4, 6, Resp. to Mtn. for Summ. J., ECF No. 49-1, PageID.1857. Plaintiff alleges that Officer Chojnowski hit Evangelista's car at 4:17:18-:23, causing him to hit the car driven by Officer Cheung in the front. *Id.* at ¶¶ 7-8; *see also* Compl., ECF No. 1, PageID.1-4. The Officers allege that Evangelista repeatedly accelerated forward and backward in this span of time, hitting Chojnowski and Cheung's cars. ECF No. 48, PageID.1377-78.

3

Both sides agree that Cheung eventually rolled down his window and shot four times. Two of his rounds struck Evangelista in the head and the shoulder. ¶ 12, Resp. to Mtn. for Summ. J., ECF No. 49-1, PageID.1861. Evangelista personally does not have any memory of the incident. *Id.* at ¶ 15.

Plaintiff alleges that the Officers used excessive force against him in violation of the Fourth and Fourteenth Amendments and that the City of Fraser is liable to him because of this incident. He also alleges state tort claims of assault and battery and gross negligence. Defendants filed a motion for summary judgment, and the Court heard oral argument on June 4, 2021.

## II.   STANDARD OF REVIEW

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013); see also Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Eward*, 241 F.3d 530, 531 (6th Cir. 2001).

The moving party has the initial burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. The trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). The Court must then determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to the trier of fact or whether the moving party must prevail as a matter of law. *See Anderson*, 477 U.S. at 252.

### III.   ANALYSIS

### A.   Fourteenth Amendment liability

In an excessive force claim under § 1983, the first step is to determine the "specific constitutional right" infringed on when force was used. *Graham v. Connor*, 490 U.S. 386, 394 (1989). "[If] a constitutional claim is covered by a specific constitutional provision, such as the Fourth

or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997).

If use of force occurs during an arrest or seizure, the Fourth Amendment applies. *Aldini v. Johnson*, 609 F.3d 858, 865 (6th Cir. 2010); *see also Graham,* 490 U.S. at 395. A seizure involves "either the application of physical force, however slight," or "submission to an officer's "show of authority" to restrain the subject's liberty." *Gardenhire v. Schubert*, 205 F.3d 303, 313 (6th Cir. 2000).

A police officer's use of deadly force by shooting a suspect with a gun on is considered a seizure. *Tennessee v. Garner*, 471 U.S. 1, 2 (1985). There is no question, therefore, that Evangelista was seized and his Fourth Amendment rights applied when Officer Cheung shot him. To the extent it is relevant to the liability of the other Officers, a contextual analysis of the entire pursuit and analysis indicates that the seizure likely began when Evangelista could no longer leave: when Officer McLaughlin's car showed up and Plaintiff was boxed in on three sides. *See, e.g., United States v. Pavelski*, 789 F.2d 485, 488 (7th Cir. 1986).

Regardless, because this incident involved a seizure, the correct analysis is the Fourth Amendment standard for excessive force. Defendants' Motion is granted as to any claims under the Fourteenth Amendment in Count I.

## B.    Fourth Amendment liability for excessive force

Whether an officer's use of force violates the Fourth Amendment hinges on "whether the officers' actions are objectively reasonable." *Graham*, 490 U.S. at 397. It is not appropriate to evaluate the situation with the perspective of hindsight; courts must consider "the perspective of a reasonable officer on the scene." *Id.* at 396. The totality of the circumstances must be considered. *Id.* The Sixth Circuit has articulated the following factors to help evaluate the totality of circumstances and determine whether an officer's actions are reasonable: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Sigley v. City of Parma Heights*, 437 F.3d 527, 534 (6th Cir. 2006).

If an officer uses deadly force, factor (2) is a minimum requirement: deadly force "may be used only if the officer has probable cause to believe that the suspect poses a threat of severe physical harm." *Mullins v. Cyranek*, 805 F.3d 760, 766 (6th Cir. 2015) (quoting *Untalan v. City of Lorain,* 430 F.3d 312, 314 (6th Cir. 2005)). The threat must be assessed at the moment the force is used. *Id.* Factor (2) has been further developed with respect to the use of deadly force during a car chase: the critical question is whether officers had objective "reason to believe that the fleeing car presents an imminent danger to officers and members of the public in the area." *Latits v. Phillips*, 878 F.3d 541, 548 (6th Cir. 2017).

### i.    Factor (1): seriousness of crime

Chojnowski began his pursuit because Evangelista ran a red light. Chojnowski Dep. 25:7-9, 28:6-8, ECF No. 48-6, PageID.1672. Cheung knew that the reason for pursuit was a traffic stop. Cheung Dep. 58:13-14, ECF No. 48-8, PageID.1765. McLaughlin did not know the reason for the pursuit. McLaughlin Dep. 37:13-19, ECF No. 48-7, PageID.1700. This factor therefore weighs against a significant use of force by Chojnowski and Cheung, who knew that the violation at issue was merely a civil infraction. The factor could be neutral or in favor of McLaughlin—he might have assumed a more serious crime given the nature of the pursuit and the fact that there was a call for backup.

### ii.    Factor (2): immediate threat to safety

Defendants make a number of arguments as to why there is no genuine dispute that Evangelista was a threat to safety. ECF No. 48, PageID.1380-82. The most relevant of these have to do with the nature of Evangelista's driving. They assert that during the chase, Evangelista was driving up to 60 miles per hour in residential neighborhoods while disregarding stop signs and lights. *Id.* at PageID.1375. While this is technically correct, review of the entire incident shows that for at least half the chase, both cars are driving under 25 miles per hour. Chojnowski (presumably as a result of Evangelista's speeds) starts going faster between 4:13:00-4:15:00, hitting 60 mph for the first time at 4:14:57. The rest of the chase proceeds at between 20-40 mph. # 37.

8

Next, Defendants cite the various Officers' accounts of what happened after Evangelista spun out onto 15 Mile Road. While their briefing asserts that Evangelista first hit Chojnowski after spinning out, Chojnowski testifies that he "may have not completely stopped" when he approached Evangelista and their cars collided. Chojnowski Dep. 35, ECF No. 48-6, PageID.1674. Chojnowski's video does not make it clear whether the first impact resulted from Chojnowski hitting Evangelista or the other way around, or whether they accelerated into each other. #37, 4:17:06. The video next shows Evangelista making a J-turn and a subsequent collision with Chojnowski's vehicle. #37, 4:17:24. But again, the video does not make it clear whether Evangelista reversed into Chojnowski's car, Chojnowski accelerated forward into him, or both. #37, 4:17:24. Plaintiff's expert report asserts that during this hit, both cars were in motion: Evangelista was reversing at the same time that Chojnowski was moving forward and hit him. ECF No. 49-6, PageID.2028-29.

Evangelista's car hit Cheung's car twice. Cheung testified that he believed both hits represented a serious threat. Cheung Dep. 46-53, ECF No. 48-8, PageID.1753-60. His camera did not face Evangelista's car, so the hits are not captured directly on either his video or on Chojnowski's. Plaintiff provides an expert report that indicates that the first hit was at 4:17:21, at approximately 8 mph, and the second was at 4:17:25, at an unconfirmed lower speed. ECF No.49-6, PageID.2026, 2030. The expert

report raises questions as to whether a reasonable officer would have felt there was a "serious threat" given the low speeds.

Evangelista, according to Cheung, was continuing to accelerate after the second hit. Cheung Dep. 50, ECF No. 48-8, PageID.1757. But neither Chojnowski's nor McLaughlin's videos show that Evangelista's car is accelerating forward at the time that Cheung shot. #37, 4:17:25-:33; #31, 4:17:25-:31. According to Plaintiff's expert, Evangelista was stopped and unable to move as of 4:17:26. ECF No. 49-6, PageID.2031. And at the time Evangelista's car was examined by an evidence technician, the gearshift (presumably in the last position it was in before Evangelista was shot) was in reverse. Police Report, ECF No. 48-2, PageID.1592.

Officers could hear Evangelista's engine revving and tires squealing, and there was smoke. This can also be seen on the video. Such sights and sounds certainly added to the perception of a possible threat. Cheung also testified that he feared continued evasion or movement by Evangelista, and that he did not know that Chojnowski's car was behind Evangelista. Cheung Dep. 46-53, ECF No. 48-8, PageID.1753-60. But the videos show that at the time Cheung shot, Evangelista was boxed in on three sides, and the distance between Chojnowski's car and Cheung's car was essentially the length of Evangelista's car—he had virtually nowhere to go. These physical circumstances raise the question of whether a reasonable officer would have been able to perceive Chojnowski's car

there if he arrived at the scene after Chojnowski, as Cheung did. Cheung also testified that he did not see a weapon and was not under the impression that Evangelista had a weapon. Cheung Dep. 58, ECF No. 48-8, PageID.1765. Under those circumstances, there is at least a question of fact as to whether it was reasonable to expect a dangerous threat— either from Evangelista himself or from his car—at the time that Cheung shot him.

Additionally, the Officers assert that Evangelista was "weaponizing" his automobile and cite two Supreme Court cases for the idea that this is dispositive in considering whether there was a threat of severe harm. ECF No. 51, PageID.2572. While these cases do involve the boxing in of cars or shooting into a suspect's car, the excessive force inquiry is fact-specific: there is no clear direction from the Supreme Court as to what constitutes "weaponizing" a car, and at any rate the totality of the circumstances would still matter. These cases do not stand for the proposition that allegedly striking an officer with a car or fleeing in a car are dispositive events. *See Brosseau v. Haugen*, 534 U.S. 194 (2004) (declining to consider whether the shooting constituted excessive force); *Plumhoff v. Rickard*, 572 U.S. 765 (2014) (deadly force found to be reasonable because plaintiff's actions, including driving on a busy highway at over 100 mph and clearly accelerating into more than one police vehicle, "posed a grave public safety risk").

11

Defendants also argue that there is video footage of essentially the entire incident, and therefore under *Scott v. Harris*, Plaintiff cannot challenge the officer's version of events or escape a finding of threat to safety. ECF No. 48, PageID.1383. But in *Scott*, the police videos "blatantly contradicted" the plaintiff's version of events, and the Supreme Court found the trial court was therefore not required to adopt his version of facts at the summary judgment stage despite his being the non-movant. 550 U.S. 372, 379-80 (2007) (plaintiff said he "remained in control of his vehicle" and that he was not a "threat to pedestrians," while video footage showed his vehicle "racing," "swerve[ing] around more than a dozen other cars," "placing police officers and innocent bystanders alike at great risk of serious injury"). The videos here do not "blatantly contradict" Plaintiff's version of events, as told through his expert report. *Scott* does not require that we find Evangelista's driving maneuvers to constitute a threat to safety.

Overall, there are genuine issues of material fact raised by both the dash camera footage videos and by Evangelista's expert report as to whether it was objectively reasonable for the officers to conclude that Evangelista was a serious threat, and for Cheung to conclude that he posed a "threat of serious physical harm" such that deadly force was justified.

### iii.   Factor (3): whether suspect is actively resisting arrest or attempting to evade arrest by flight

It is undisputed that Evangelista initially evaded arrest by flight: he did not pull over as soon as Chojnowski began following him with his sirens on, and instead led him on a chase for at least six minutes. However, once he spun out and backed around, the picture becomes less clear. From the videos alone it cannot be determined which of the cars were moving or whether multiple cars were moving into each other. For example, Evangelista's expert report asserts that the second impact to Cheung's vehicle was caused by Chojnowski pushing into Evangelista's car from behind, not by Evangelista was accelerating towards Cheung. ECF No. 49-6, PageID.2030.

The Court does not have the benefit of Evangelista's testimony or memory of the events. Therefore, even construing the evidence in the light most favorable to him, that evidence does not permit any conclusions about his *motivations* as he was making his maneuvers. If the jury were to credit Plaintiff's expert report, it offers some evidence in support of the inference that when he began reversing his car, Evangelista may have been doing so to back away from Cheung's car (which had appeared in front of him) to avoid hitting him again, rather than to actively flee.

During at least some of the incident, it is uncontroverted that Evangelista was resisting arrest or fleeing, and that factor weighs in

13

favor of a reasonable officer concluding that some use of force was necessary to stop him. Use of deadly force, however, would only be reasonable if the resistance created a serious threat to the safety of the officer. And the facts are disputed as to whether that level of threat was present. On this record there is a question of fact as to whether Evangelista's efforts to flee near the end of the incident were so clearly "active" that they would present a serious threat to the safety of the officers and justify such a high degree of force being used.

### iv. Liability of each officer

Given the nature of this incident, the various factors in the *Sigley* analysis need to be applied to each officer individually. They each used different amounts of force and each came to the scene with a different "perspective" to be considered.

### 1. Officer Chojnowski

Officer Chojnowski hit Plaintiff's car at least once, and also participated in boxing him in. Chojnowski testifies that the first time he hit Plaintiff, it was because he thought "the pursuit was done" and was attempting to come to a stop. Chojnowski Dep. 35, ECF No. 48-6, PageID.1674. The second time, when he maneuvered his car behind Plaintiff's, it was to "prevent Enzo from continuing to ram Officer Cheung's car. To put a stop." *Id.* at 42, PageID.1676.

There is no evidence that Chojnowski's use of his car was particularly aggressive or violent. Even if there could be some dispute

about factor (2), his maneuvers of bumping into and boxing in Evangelista's vehicle do not constitute an unreasonable use of force during a car chase even if Evangelista presented a very low threat. *Cf. Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 486-87 (6th Cir. 2007) (boxing in and eventual use of force on a car chase suspect, neither found to be an unreasonable use of force); *Galas v. McKee*, 801 F.2d 200, 203 (6th Cir. 1986) (finding that a high-speed pursuit is a reasonable method of seizing a traffic violator). Given the totality of circumstances, Officer Chojnowski did not engage in excessive force.

### 2. Officer Cheung

Officer Cheung used deadly force: he fired four shots at Evangelista, striking him twice. As a threshold matter, because there are questions of material fact as to whether Evangelista posed an immediate threat of severe harm at the time Cheung shot him, the Court cannot find that deadly force was justified as a matter of law. Cheung also knew that the pursuit was only for a civil infraction, creating at least a question of fact as to whether his use of deadly force was excessive.

### 3. Officer McLaughlin

Officer McLaughlin's only use of force was boxing Plaintiff in from the side. McLaughlin testifies that he moved to box in Evangelista's vehicle because he "feared for both Officer Cheung and Chojnowski." McLaughlin Dep. 35, ECF No. 48-7, PageID.1699. He came to back up the other officers because he heard on the radio that they had "one not

stopping or one running." *Id.* at 14, PageID.1694. There is no evidence that he had extensive information regarding the reasons for the pursuit of Evangelista, or the circumstances of the initial civil infraction. Nor does the evidence clearly show that McLaughlin's vehicle made physical contact with Evangelista's. The record does not suggest that his conduct constituted excessive force.

Therefore, the Defendants' Motion will be granted as to Defendants Chojnowski and McLaughlin's liability under Count I for excessive force in violation of the Fourth Amendment.

### v.   Qualified immunity

Having found that there is a genuine issue of material fact as to whether Officer Cheung used excessive force, the Court must consider whether he is nevertheless entitled to qualified immunity.

Qualified immunity determinations are made using a two-part test: (1) whether the facts, when taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right; and (2) whether the right violated was clearly established such "that a reasonable official would understand that what he is doing violates that right." *Mullins,* 805 F.3d at 765. As explained in the discussion above, the first question (whether Officer Cheung's conduct violated Evangelista's constitutional right not to be subjected to excessive force) turns on the contested factual issue of whether Evangelista's conduct presented a severe threat to the safety of Officer Cheung. The

16

second question, however, that must be answered for the claim against Officer Cheung to move forward, is whether the constitutional right at issue was clearly established.

It is clearly established law in the Sixth Circuit that "a reasonable police officer may not shoot the suspect unless the suspect poses a perceived threat of serious physical harm to the officer or others." *Sample*, 409 F.3d at 699; *see also Latits v. Phillips*, 878 F.3d 541, 548 (6th Cir. 2017). Therefore, whether a reasonable officer would understand that the conduct at issue here violates the Plaintiff's constitutional rights turns on a factual issue: whether a reasonable officer would perceive in Plaintiff's conduct a serious and imminent threat of physical harm to himself or others. Because the question of whether Evangelista posed a threat of "serious physical harm" is one for the jury, the Court cannot grant qualified immunity at this time. *See, e.g., Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998) ("Where, as here, the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability.").

### C. *Monell* liability against the City of Fraser

To establish municipal liability against the City of Fraser under *Monell*, Plaintiff must show that a violation of his constitutional rights occurred because of a municipal policy or custom. 436 U.S. 658, 694 (1978). This showing can be made by demonstrating one of the following: "(1) the existence of an illegal official policy or legislative enactment; (2)

17

that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). A municipality is not liable for injury inflicted by its employees or agents in the absence of this showing of policy or custom. *Id.*; *see also Monell*, 436 U.S. at 694. The plaintiff must also identify a connection between the policy or custom and the unconstitutional conduct that led to their injury; the policy or custom must be the "moving force" behind the eventual constitutional violation. *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019) (quoting *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013)).

Evangelista alleges that the City of Fraser is liable because there is a "custom of pursuing fleeing law violators for civil infractions," and that it failed to properly train its officers regarding proper tactics in vehicle pursuit situations. ECF No. 49-1, PageID.1872-74. But he does not provide enough evidence to raise an issue of material fact about *Monell* liability under either theory.

As to the first theory, Plaintiff merely makes a conclusory statement that "such chases are ubiquitous practices among police officers employed by the City of Fraser." *Id.* at PageID.1872. There are no prior instances, reports, or cases cited to show a persistent pattern. The City in fact states in its official policies that "Officers shall not pursue fleeing vehicles for civil infractions," PageID.1817; no more than two

18

vehicles can be involved in pursuit without approval of a supervisor, PageID.1819-20; and that boxing in a fleeing violator or ramming it is not allowed unless the use of deadly force has been authorized, PageID.1821. ECF No. 48-9. Taking the facts in the light most favorable to Plaintiff, the most he can say is that in this instance, several officers violated department policies. But even assuming the "moving force" inquiry is satisfied—that these individual violations rose to the level of violating constitutional rights in that they eventually led Cheung to shoot Evangelista—this is not enough to support *Monell* liability without more evidence that there is a ubiquitous practice of engaging in these kinds of chases across the department.

Regarding a possible "failure to train" violation, Plaintiff's claim is premised on the fact that none of the three officers considered abandoning the pursuit even though it was in violation of department policy. ECF No. 49-1, PageID.1872-73. To show failure to train, Plaintiff must show "that a training program is inadequate to the tasks that the officers must perform; that the inadequacy is the result of the city's deliberate indifference; and that the inadequacy is "closely related to" or "actually caused" the plaintiff's injury." *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390-91 (1989)).

Plaintiff acknowledges that he cannot show deliberate indifference through a pattern of officers breaking Fraser's rules about pursuit;

rather, he seeks to show that the violations at issue here are a "highly predictable" or "plainly obvious" consequence of the training (or lack thereof) that officers received on how to engage in pursuits. ECF No. 49-1, PageID.1872. To some degree, *Canton* leaves open the possibility that a municipality's failure to provide basic training to ensure that officers' most routine and necessary tasks are conducted in accord with the Constitution may be evidence of deliberate indifference. *Canton,* 489 U.S. at 390. But this sort of "single-incident" liability is rare and is not present here: the Supreme Court has indicated that successful failure-to-train violations almost always require a showing of a *pattern* of illegal behavior. *See Connick v. Thompson*, 563 U.S. 51, 62 (2011). Because Plaintiff fails to do that here, Defendants' motion as to Count II is granted.

### D. State tort claims

Plaintiff's last two claims for assault and battery (Count III) and gross negligence (Count IV) are brought under state tort law. Michigan's government tort liability act (GTLA) preempts tort claims against state employees: "[u]nder the GTLA, governmental agencies and their employees are generally immune from tort liability when they are engaged in the exercise or discharge of a governmental function." *Ray v. Swager*, 903 N.W.2d 366, 370 (Mich. 2017); M.C.L. 691.1407. Agencies or municipal entities do not have to specifically plead immunity; it is presumed. *Mack v. City of Detroit*, 649 N.W.2d 47, 56 (Mich. 2002). To

overcome immunity, a plaintiff must state a claim that fits within one of five enumerated statutory exceptions or plead facts "that demonstrate that the alleged tort occurred during the exercise or discharge of a nongovernmental or proprietary function." *Id.* at 57. Plaintiff has not done so, and therefore the City of Fraser cannot be liable in tort.

Individual state employees are also entitled to immunity from state tort claims under the GTLA, though they need to plead that immunity as an affirmative defense. *Odom v. Wayne Cty.*, 760 N.W.2d 217, 227-28 (Mich. 2008). Though they do not specifically cite the statute, Court is satisfied that the Officer Defendants did so through their references to the use of reasonable force to effectuate their duties in ¶ 26 of their Answer. ECF No. 14, PageID.62.

Given that immunity applies, the Officer Defendants cannot be held liable for the intentional torts of assault and battery if "(a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority, (b) the acts were undertaken in good faith, or were not undertaken with malice, and (c) the acts were discretionary, as opposed to ministerial." *Odom*, 760 N.W.2d at 228. The "good faith" part of this standard looks for "malicious intent, capricious action or corrupt conduct" or "willful and corrupt misconduct . . . ." *Id.* at 225. Plaintiff has not put forward evidence that creates a genuine issue of material fact as to

21

whether the officers were acting in good faith, and therefore they cannot be held liable on Count III.

Liability for gross negligence under the GTLA requires a court to "determine if the individual caused an injury or damage while acting in the course of employment or service or on behalf of his governmental employer and whether: (a) the individual was acting or reasonably believed that he was acting within the scope of his authority, (b) the governmental agency was engaged in the exercise or discharge of a governmental function, and (c) the individual's conduct amounted to gross negligence that was the proximate cause of the injury or damage." *Odom,* 482 Mich. at 479-80.

For police officers who are acting in the course of routine duties such as conducting a traffic stop or making an arrest, the most important inquiry is the third one: whether their conduct in the course of that otherwise "governmental function" amounts to gross negligence that was the proximate cause of the injury or damage. *See, e.g., Crehan v. State*, No. 282883, 2009 WL 609556, at *3 (Mich. Ct. App. Mar. 10, 2009). Gross negligence under the statute is conduct that is "reckless as to demonstrate a substantial lack of concern for whether an injury results." M.C.L. § 691.1407(8)(a). Here, the facts as alleged do not show that any of the Defendant Officers' actions were so reckless as to meet this standard.

22

Therefore, the Defendants' motion is granted in full as to Count III (assault and battery) and Count IV (gross negligence).

## CONCLUSION

For all the reasons set out above, Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART.** Specifically, Counts II (*Monell*), III (assault and battery), and IV (gross negligence) are **DISMISSED WITH PREJUDICE**. Count I (excessive force) is also **DISMISSED WITH PREJUDICE** as to Officers Chojnowski and McLaughlin in full and as to any claims under the Fourteenth Amendment against Officer Cheung. The remaining claim in this lawsuit is Count I (excessive force) against Officer Cheung under the Fourth Amendment. As there are no claims remaining against the other Defendants, the Clerk's Office is directed to remove the City of Fraser, Officer Chojnowski, and Officer McLaughlin as Defendants in this action.

**SO ORDERED**, this 29th of September, 2021.

BY THE COURT:

/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge

23